# EXHIBIT 1

I hereby Certify that the foregoing is a true
copy of the original on file in my office.

*James S. La Corte, Surrogate*

**FILED**

MAR 15 2010

James S. LaCorte, Surrogate

Howard Brookman, Esq.
145 Springfield Road
Elizabeth, New Jersey 07208
(908)-355-1921

IN THE MATTER OF FLORENCE SIEGAL,

AN ALLEGED INCAPACITATED PERSON

SUPERIOR COURT OF
NEW JERSEY
CHANCERY DIVISION, Probate Part,
Union County

Docket No.  O - 7520

**Civil Action**

### ORDER FOR HEARING

This Matter having been opened to the Court by Howard Brookman, Esq., Petitioner; and the Court having reviewed the Verified Complaint, Certification and legal brief attached thereto and other documents on the application; and the Court being satisfied with the sufficiency of such papers and that further proceedings should be taken thereon;

**IT IS,** on this 15th day of March, 2010,

**ORDERED,** that pursuant to R. 4:86-7, this action be set down for hearing before this Court at 2 Broad Str., Elizabeth , New Jersey before the Hon. John F. Malone, P.J.Ch. on the 15th day of April, 2010, at 9 o'clock, or as soon thereafter as counsel may be heard; and it is further

**ORDERED,** that at least 20 days' notice of such hearing be given to the following interested parties: Jeffrey Brookman, 145 Springfield Road, Elizabeth, NJ 07208; Barbara Brookman, 902 Salem Avenue, Hillside, NJ 07205; and the Office of the Public Guardian, P.O. Box 812, Trenton, NJ 08625, by delivering to each of them copies of this Order, the Verified Complaint and all supporting Certifications; by certified mail, return receipt requested and regular mail. Proof of Service must be filed with the Court before the return date, it is further

**ORDERED,** that any interested person who desires to be heard in this action either personally or through legal counsel shall, not later than 3 days before the hearing date, serve upon counsel for the Petitioner and file with this Court such interested person's answer ~~and/or opposing certification. This action may proceed ex-parte with respect to all such interested persons so defaulting.~~ The filing fee for said Answer is $ 110.00, payable to the Union County Surrogate. If no Answer is filed the matter may proceed ex parte.

JAMES S. LA CORTE, SURROGATE

RECEIVED PAYMENT
JAMES S. LA CORTE, Surrogate

**FILED**

MAR 1 5 2010

James S. LaCorte, Surrogate

Howard Brookman, Esq.
145 Springfield Road
Elizabeth, New Jersey 07208
(908)-355-1921

IN THE MATTER OF FLORENCE SIEGAL,

AN ALLEGED INCAPACITATED PERSON

SUPERIOR COURT OF
NEW JERSEY
CHANCERY DIVISION, Probate Part,
Union County

Docket No. O-7520

**Civil Action**

**VERIFIED COMPLAINT**

Howard Brookman, Esq., Petitioner in the above entitled action, says:

1. Howard Brookman, Esq. was duly named as Power of Attorney by Florence Siegal in the Year 2000. (Exhibit G). Mr. Brookman was also named by Florence in her Healthcare Proxy Directive.

2. Florence Siegal was born in Bayonne, Hudson County, and is a lifelong resident of Hudson County, where she continues to own a condominium apartment. Thus, venue for this action is properly laid in Hudson County pursuant to R. 4:83-4(b).

3. Florence had been close friends with Petitioner's family for 47 years. Over the years, Florence became a member of the Brookman family, attending family celebrations and accompanying Petitioner and his family to numerous social occasions including many charitable functions at locations throughout the metropolitan area. Florence even

1

accompanied Petitioner and his family when he was invited to a breakfast reception with former President Bill Clinton. (Exhibit C).

4. Florence was falsely declared incapacitated and involuntarily placed in an a nursing home in 2007 when counsel for the hospital to which she had been admitted, improperly filed a petition for guardianship notwithstanding the existence of the power of attorney.

5. The Order declaring Florence to be incapacitated was procured solely as a result of the fraud and deceit of counsel for the petitioner hospital. Counsel for the hospital, a first-year law firm associate, submitted an alleged certification purporting to be from a psychiatrist- medical doctor. In fact, said individual, contrary to the assertion made in the certification, is <u>not</u> a medical doctor. It is apparent that said certification was a complete forgery and fabrication.

The fact that the sole psychiatrist's certification which was submitted to the court in support of a declaration of incapacity now turns out to be a forgery alone requires that the declaration of incapacity be reversed. (Exhibit A).

6. Additionally, the petition referenced in Paragraph 4 falsely and fraudulently alleged, with regard to Florence, that upon admission the patient was diagnosed with contractures dehydration and malnutrition. The petition also falsely claimed that it was the attending physician's "professional medical opinion" that Florence "appeared to suffer from negligent skin care, nutritional neglect and overall neglect."

7. The above claims made regarding alleged dehydration, malnutrition and neglect were false and were made with the knowledge of their falsity. To the contrary, these allegations were instead the complete and utter fabrications of the first-year associate who was acting as counsel for the hospital. Said fabrications were made to ensure that the court would not only sign a declaration of incapacity, but would also revoke the Power of Attorney naming the Petitioner, Howard Brookman. (Exhibit C).

8. Counsel for the hospital drafted, prepared and type a  Certification attributed to and purportedly later signed by Frank Ostella. Ostella is affiliated and employed by the hospital  as a member of its medical staff.

9. The Certification attributed to Frank Ostella is patently false. The Certification of Frank Ostella is entitled "Certification of Frank Ostella, M.D." Said certification begins with the words: "I, Frank Ostella, M.D."

10. The truth is that Frank Ostella is not an M.D. Ostella is not a medical doctor. Ostella

2

did not graduate from a medical school. The truth is that Frank Ostella is a doctor of osteopathy.

11. Upon information and belief, Frank Ostella never even read the Certification attributed to him. A reputable doctor of osteopathy would never sign a certification falsely claiming to be a medical doctor. (M.D.) A doctor of osteopathy would risk his license by falsely and fraudulently claiming to be a medical doctor. Indeed, Section 13.35--6.1 of the New Jersey Administrative Code requires physicians to always accurately identify their education and accreditation and states that "any use of an academic degree or professional or membership abbreviation not in accordance with these standards shall be deemed a misrepresentation and professional misconduct."

12. Upon information and belief, Frank Ostella never even met with Florence. Indeed, the hospital medical records contain no Consultation Report for any Frank Ostella, a Consultation Report which would surely exist if, in fact, Frank Ostella had ever met with Florence as claimed in the Certification attributed to him.

13. As noted above, there was no hearing in this matter. Neither Frank Ostella nor Florence testified. No psychiatrist testified. Nobody testified. Petitioner was not accorded an opportunity to rebut and refuse the false allegations concerning Florence's alleged medical condition.

14. The Judgment of Incapacity declaring Ms. Siegal incapacitated and appointing a Guardian was improper as (1) Ms. Siegal is not incapacitated (2) no hearing was held and, in any event, (2) Ms. Siegal had named a Power of Attorney in 2000, at a time when she was undeniably competent. The pre-existence of a Power of Attorney negates the need for the appointment of a Guardian.

15. Since its appointment in June 2007 (2.5 years) the Public Guardian has failed to provide either the Court or the interested parties with an accounting pursuant to N.J.S.A. 3B:12-63 and R. 4:86-6(c).

## SOCIAL WORKER CERTIFICATION

16. The Public Guardian's own Case Manager/Social Worker Judith Englander has written a Certification evidencing a return to competency. (Exhibit B).

3

17. The undated Certification of Social Worker Judith Englander asserts that Florence "is alert and answers questions." (Exhibit B). This description of Florence is at odds with the description set forth in Frank Ostella's now-discredited certification.

18. Ms. Englander's Certification also describes Florence as someone who is "an active participant in music and art activities," as someone who "attends religious services and enjoys singing the songs, which are very familiar to her." (Exhibit B).

19. The above description is clearly the description of someone who has regained mental capacity pursuant to R. 4:86-7.

**WHEREFORE,** Howard Brookman, Esq. petitions this Court for judgment:

1.   Adjudicating Florence Siegal capacitated and able to make choices regarding her personal, medical, and financial care and affairs;

2. Reinstating the Power of Attorney that was wrongfully revoked without factual or legal basis and permitting Howard Brookman to immediately invoke said Power of Attorney;

3. Alternatively, modifying the Guardianship pursuant to R. 4:86-7 to name Howard Brookman Guardian of the Person and the Property of Florence Siegal;

4. Permitting Howard Brookman to immediately resume visitation with Florence Siegel at the nursing home prior to her discharge;

5. Ordering the Office of the Public Guardian to submit a formal accounting from the period of May 24, 2007 through the present to this Court and all interested parties;

6. For such other relief as the Court deems just, proper and equitable.

Howard Brookman, Esq.

Dated:  February 1, 2010

## CERTIFICATION PURSUANT TO R: 4:5-1

I, Howard Brookman, Esq., certify that:
    1. I am the Petitioner in the above matter.
    2. The matter in controversy (the return to capacity of Florence Siegal) is not the

4

subject of any other action pending in any court or of a pending arbitration proceeding and no other action or arbitration proceeding is contemplated. At this time, the Petitioner knows of no other party who should be joined in the action.

    3.  I certify that the foregoing statements made by me are true. I am aware that if any of the foregoing statements are willfully false, I may be subject to punishment

Howard Brookman

Dated: February 1, 2010

## VERIFICATION

    I, Howard Brookman, Esq., certify that I have read the allegations contained in the foregoing Complaint and that said allegations are true to be best of my personal knowledge. I certify that the foregoing statements made by me are true. I am aware that if any of the foregoing statements are willfully false, I may be subject to punishment.

Howard Brookman

Dated: February 1, 2010

145 Springfield Road
Elizabeth, N.J. 07208

Re: <u>IMO Florence Siegal,</u>

Dear Judge

Please accept this letter brief in support of my Motion to Vacate the Judgment of July 5, 2007 & May 25, 2007, for an Order declaring that Florence Siegal has returned to competency, and for additional relief.

### <u>The Judgment and Orders of July 5, 2007 & May 25, 2007 Must be Vacated as a Product of Fraud, Misrepresentation & Newly Discovered Evidence. Rule 4:50-1 (a)(b)(c),(f)</u>

The July 5, 2007 Order must be vacated in light of the new information discussed below. Your Honor signed an order prepared by the Office of the Public Guardian, which while asserting "there are no willing and responsible family members or friends to serve as guardians," determined Florence Siegal to be an incapacitated person, revoked Ms. Siegal's 2000 Power of Attorney and health care proxy, and appointed the Public Guardian as the guardian of Florence's person and property.

1

The Order also stated that "Barbara Brookman, Howard Brookman, and Jeffrey Brookman are not permitted access to Florence Siegal" until the resolution of the criminal charges against them. I write to advise Your Honor that at no point have any criminal charges relating to Florence even been filed against me.

Moreover, the one and only "psychiatrist" whose certification was submitted to court by my adversary in support of a judgment of incapacity turns out to have been an impostor. Attached as **Exhibit A** is the signed purported certification of Frank Ostella, swearing to the fact that he is a Medical Doctor (M.D.), under penalty of punishment.    In fact, as confirmed by the attached printout from the N.J. Attorney General's website, Ostella did not graduate from medical school and is not a medical doctor.  He is in fact a doctor of osteopathy (D.O.) Your Honor relied on Ostella's certification in declaring Florence incapacitated and, as it now turns out, Your Honor was misled and a fraud was perpetrated on the Court. It was solely on the basis of Ostella's claim about Florence's mental state, that she was declared incapacitated, turned over to the Public Guardian and sentenced to a life in isolation in a nursing home. If Ostella could even lie about his education and accreditation,  than nothing else he says can be believed, including his claim that he ever met with Florence. In fact, Ostella never prepared any Consultation Report that would have been prepared if he, in fact, met with Florence.

Rule 4:50-1 states as follows in pertinent part: "the court may relieve a party . . . from a final judgment or order for the following reasons:"

(a) mistake, inadvertence, surprise, or excusable neglect;
(b) newly discovered evidence which would probably alter the judgment or order . . .
(c) fraud, misrepresentation, or other misconduct of an adverse party;
  (f)  any other reason justifying relief

It is submitted that all of the above grounds apply; it could not have been anticipated that a man would have impersonated a medical doctor, but that is just what occurred here. Moreover, the March 2008 certification of Social Work Judith Englander of the Public Guardian's Office (discussed below) is at odds with the certifications of the two doctors previously submitted and warrants a reconsideration of the issue of incapacity.

2

It also now clear that the purported certification of Ostella falsely claimed that "it is my professional and medical opinion that the Patient [Florence Siegal] is incapable of attending a hearing in this matter because of her inpatient hospital status. She would not be able to discharged to attend such proceedings." (Exhibit A). As we know now, that allegation was completely false and was made with the knowledge of its falsity. The truth is that just 8 days after that certification was dated, Florence was discharged from the hosptial on May 31, 2007. The proceeding before Your Honor did not take place until June 21, 2007. If Florence could have been discharged and transported to a nursing home, she certainly could have been transported to your courtroom.

It is also now clear that the purported certification of Dr. Guittari claiming that Florence suffered form malnutrition or neglect was also demonstrably false. Indeed, the hospital medical records obtained by the Brookman's in late 2007 disclose that nowhere in those records is Florence described as being malnourished. Moreover, nowhere in Dr. Guittari's medical notes does he describe Florence as being neglected. Therefore, the allegations that Florence suffered from malnutrition or neglect were the complete fabrications of the hospital's attorney, first-year associate Eric Gross, who also falsely claimed that Frank Ostella is a medical doctor.

> The appeal that was taken from Your Honor's 2007 Order was not affirmed by the Appellate Division. Instead, that appeal was mistakenly dismissed on a technicality having nothing to do with the merits of whether or not Florence was incapacitated or whether or not the Power of Attorney should have been revoked. Your Honor has the authority to amend your July 5 Order. Indeed, New Jersey Court Rule 1:31-1 states that "errors [in an order] arising from oversight and omission may **at any time** be corrected by the court on its own initiative or on the motion of any party, It was an error for the Power of Attorney to have been revoked with regard to Jeffrey on the basis of a charge against Jeffrey which has now been dismissed. It was also error for the Power of Attorney to have been revoked with regard to Howard despite the fact that he was never even accused of any neglect with regard to Florence. If the certification attributed to Ostella, but actually written by a law firm 1st-year associate, Eric Gross, could have lied about Ostella's education and accreditation, than nothing else contained in that certification can be believed, including his claim that he ever met with Florence. In fact, Ostella never prepared any Consultation Report that would have been prepared if he, in fact, met with

3

Florence.

This matter was a contested guardianship application and should have been treated as such from the outset.

## I AM AN INTERESTED PARTY IN THIS CASE

The 2000 Power of Attorney grants me Power of Attorney over Florence's affairs, in the event of her incapacity. (See this Power of Attorney annexed hereto as **Exhibit G**). I never had to use this Power of Attorney. Florence Siegal executed this valid Power of Attorney many years ago thereby obviating the need for a guardian to be appointed, even if Florence would be determined to be incapacitated or incompetent. It is well settled that the reason why people execute powers of attorney is so that a guardian would not need to be appointed by the court in the event of incapacity. The Power of Attorney was prepared by a lawyer and signed at a time when Florence was indisputably competent. Her competency is attested to by the contemporaneous medical reports of three doctors, who both attested to Florence's competency and her ability to sign a power of attorney and make decisions regarding her affairs. (See medical reports annexed hereto as **Exhibit C** ) .Florence's competency was also attested to by the Superior Court of New Jersey, whose 2002 default judgment noted that Florence was "not incompetent." Your Honor's July 5, 2007 judgment also included a provision awarding an attorney several thousand dollars based upon his 2002 default judgment against Florence, a default judgment obtained when that attorney certified that Florence was not incapacitated at that time.

In 2002, Court Rule 4:86-2 was amended to specifically require that any Guardianship application Complaint list the names of those persons named as attorneys-in-fact in the Power of Attorney as well as those named as in Healthcare Proxies. The amended Rule 4:86-4 also requires that attorneys-in-fact be served notice of the guardianship application, obviously so that

4

they may oppose it if they wish. Although we were listed in the guardianship application, we were not permitted to oppose the guardianship application. Instead, Your Honor ruled that we had no standing to object.

In 2000 Florence also signed a healthcare directive in which she gave me authorization to make healthcare decisions on her behalf in the event of her incapacity. Therefore, the existence of the Power of Attorney, along with the healthcare directive, is why I am indeed an interested party to this proceeding.  Moreover, in the matter that came before Your Honor in 2007, I and my family were specifically listed as interest parties. (**Exhibit D**)

## **FLORENCE IS NOT INCAPACITATED AT THIS TIME SUCH THAT A GUARDIAN NEEDS TO BE APPOINTED**

At a minimum, Florence is entitled to a proper plenary hearing to determine whether or not she is currently competent. This is especially so considering the now-discredited certification of Frank Ostella, the sole psychiatrist upon whose certification Your Honor mistakenly relied. Florence must be brought to court to be personally observed by a judge so that he can see for himself  her condition and not simply rely on deficient, unsubstantiated, contradictory and outright perjurious certifications. Furthermore, the  May 25 Order even noted that any Health Care Proxy or Power of Attorney would only be suspended "pending a plenary hearing."   No such hearing was held, nor was our June 2007 "Opposing Certification" to the Petition for Guardianship even taken into consideration.   A plenary hearing is required in a return to competency hearing pursuant to Rule 4:86-7 and caselaw. In the Matter of Walter Macag, 377 N.J. Super. 167 (App. Div. 2005); see also, Matter of Estate of Frisch, 250 N.J. Super. 438 (Law Div. 1991).

### The Court-Appointed Attorney failed to ask Florence what she wants

Court Rule 4:86-4(b) specifies the "Duties of Counsel" for the alleged incapacitated person. It is clear that Mr. Armstrong did not carry out his duties. According to this rule, that court-appointed

5

attorney is required to "state whether the alleged incompetent has expressed dispositional preferences and, if so, <u>counsel shall argue for their inclusion in the judgment of the court.</u>" Dispositional preferences include such things as where and with whom the person wishes to live. According to the transcript of his own interview with Florence, the court-appointed attorney, appointed to inquire and advocate for Florence's wishes, did not even ask Florence whether she wanted to live in a nursing home, let alone argue for her wishes. The Supreme Court has held that a court-appointed attorney for an alleged incapacitated person is supposed to be a zealous advocate for the wishes of the person. <u>In re M.R.</u> 135 <u>N.J.</u> 155 (1994). Here, the court-appointed attorney did not even ask Florence what she wants, let alone advocate for her position. <u>M.R.</u> also held that even an incapacitated person may decide where they wish to live.

This Court must respect Florence's own intention and desires about where and with whom she wants to live.  Florence's intention was most recently expressed on May 11, 2007, two days after being admitted to the hospital.  At that time, Florence was asked by me whether she was hungry or thirsty and  "What does she want?"  Florence immediately grabbed my hand with her own and, in front of the head shift nurse, stated to me "I want to be with you."  Several days later, Florence was again videotaped in the hospital while being specifically asked with whom she wants to live. Florence answered "with Barbara," referring to my mother. Florence also stated that she does not want to live in a nursing home.   There must be a plenary hearing so that our opposition to the appointment of a guardian can be considered, so that Florence can appear, and that the doctors can be questioned as to the basis for the conclusions, and so that neutral doctors can examine her.

## EVEN ASSUMING FLORENCE WAS INCAPACITATED AT ONE POINT, THE PUBLIC GUARDIAN'S OWN SOCIAL WORKER HAS SUBMITTED A CERTIFICATION EVIDENCING A RETURN TO COMPETENCY

The Petition for Guardianship and the Certifications submitted in support of it, were <u>materially and facially deficient in a number of ways.</u> These deficiencies require, at a minimum, that a proper hearing be conducted before a human being is declared incompetent and sentenced

6

to a life of solitary confinement.

Perhaps the greatest argument against the suggestion that Florence is currently incapacitated is set forth in the March 2008 Certification of Judith Englander, Case Manager of the Public Guardian's Office. Judith Englander's description of Florence as someone who is "an active participant in music and art activities;" as someone who "attends a religious service and enjoys singing the songs, which are very familiar to her;"  and as someone who **"is alert and answers questions"** is at odds with the description of Florence put forth by the two now-discredited certifications, which essentially falsely made Florence out to be a vegetable. Ten months after the May 2007 certifications describing Florence as essentially uncommunicative, we were presented with a March 2008 certification indicating that Florence "is alert and answers questions." Surely, by itself this certification indicates a return to competency. At the very least, Florence must be examined by a physician and the court at this time.

The claim in the Guardianship Petition submitted to Your Honor that Florence cannot "follow commands" was patently false. It is certainly possible to converse with Florence, as even the Public Guardian's Social Worker now concedes. While at the hospital, Florence was videotaped by us following commands to straighten and lift her own legs, which she did without a problem. As with any person of any age, Florence is at her best after eating a full meal.  While Ms. Englander claims Florence has a "declining cognitive status," her March 2008 description of Florence represents a great improvement from the description provided by the certifications and even Mr. Armstrong.

## Judith Englander's Certification

Dr. Guitarri purposely removed Florence from the solid food diet that she had been placed on, falsely claiming that he did not think Florence could even swallow. Eventually, Florence was placed on a pureed diet. However, I personally observed Florence feeding herself solid foods the very day after she was admitted to the hospital. Indeed, the hospital records confirm that Florence was on a solid food diet for most of her stay at the hospital. It was not until May 22, 12 days after her admission that Florence was placed on a pureed diet. Therefore, Ms. Englander's claim that Florence has to be "on a pureed diet and must be fed her meals" is completely false. Florence is able to eat solid foods and is fully capable of feeding herself.  Nor is Florence "incontinent of

both bowel and bladder." Just because Florence has been forced to wear diapers for the first time in her life instead of being allowed to use the bathroom, does not make her "incontinent of both bowel and bladder." Ms. Englander's claim that Florence cannot ambulate on her own is also incorrect.

While Ms. Englander claims that Florence has "an opportunity to react with other residents" who are complete strangers to her, why shouldn't Florence be allowed to interact with the people such as the Brookmans, her neighbors and other friends who she has known for decades? If Ms. Englander was truly concerned for Florence's cognitive health she would recognize that the worst thing that can be done to a person is to deprive them of the people whom they have known for years.

Ms. Englander now claims that Florence "has never verbalized the desire to to have the Brookman's visit." Since Ms. Englander claims Florence is incapacitated, how is she expected to verbalize the desire for anything? More importantly, has Florence ever verbalized the desire to spend the rest of her life in a nursing home? No, just the opposite. Has Florence ever verbalized the desire to be placed on a pureed diet? No, she can eat solid foods without difficulty. Has Florence ever verbalized the desire to be denied access to a bathroom and forced to wear diapers? No.

Little needs to be said about Ms. Englander's baseless and vague claims that she has been harassed and threatened by agents of the Brookmans. These claims are false

The claim in the Petition that "it is not possible to converse with Florence in any meaningful way" was contradicted by the Report of Court-Appointed Attorney Chris Armstrong, Esq., whose own report indicated that he had a meaningful conversation with Florence and that she is not, as claimed by the doctors, "minimally verbal." In fact, the person described by Mr. Armstrong at the nursing home and the person described by the doctor's purported certifications sound like 2 different people.

According to Mr. Armstrong, Florence stated that she feels "good" physically. She also remembered that she was a teacher in Bayonne, never married and had no children. She

remembered her date of birth, although she was understandably hesitant about providing the year. Florence's responses to Mr. Armstrong do not indicate someone who is incompetent or incapacitated. Rather, they are the normal responses of a 90-year-old who is obviously nervous about talking to a stranger about her private matters and understandably guarded.

Perhaps most remarkably, Florence, who Dr. Ostella's certification claimed to have advanced dementia, was able to correctly subtract 100 minus 7 to get 93. **It is clear that someone who can correctly subtract 100 minus 7 is not suffering from dementia.** The Director of the nursing home describes Florence as "an adorable, sweet person," not the vegetable that Dr. Ostella and Dr. Guitarri tried to make her out to be.

In addition to the above, there are significant problems with the procedure and substance of how Mr. Armstrong conducted the interview of Florence Siegal at the nursing home. First, Mr. Armstrong admits that when he came to interview Florence, he "found her asleep" and had somebody wake her up. Later, Mr. Armstrong indicates that at the time he interviewed Florence shortly after 2PM, she had still not been fed lunch. Therefore, an interview conducted with a just awoken nonagenarian who had not yet eaten lunch is bound to produce a false picture of who they are.

Most significantly, although the Court Rules require that the alleged incapacitated person be informed both of the date and the reason for the Hearing, Florence was clearly not informed of the nature of the hearing into her competency. R. 4:86-4. <u>Mr. Armstrong told Florence only that there was a court hearing scheduled at a certain time and date. He did not tell Florence that the hearing would be about her and was to decide whether or not she is incompetent, whether a guardian would be appointed over her, who that guardian should be.</u> In short, by his own account. Mr. Armstrong erroneously did not describe the nature of the hearing to Florence, as the court rules and case law require. He did not tell Florence that this hearing would decide how and where she would spend the rest of her life. He asked Florence if she "want[ed] to go" to the hearing. When Florence, responded that she did not hear the question, Mr. Armstrong simply moved on to his next question about whether she had eaten lunch, which she had not.

Rule 4:86-4(b) states that the court-appointed attorney (Mr. Armstrong) needs to ask the alleged incapacitated person about their "dispositional preferences."   At no time during the

interview did Mr. Armstrong ask Florence whether she wanted to live in a nursing home for the rest of her life. If he had done so, Florence clearly would have said no, as she has stated to us and to numerous people recently.

There is a claim that Florence "would be unable to comprehend or participate in such proceedings in any meaningful way." This is not true. In any event, that is for a Court to decide. Florence has the right to be present at any hearing that would decide where and how she will spend the rest of her life.

Again, I must note that Dr. Ostella's Certification, which is an almost verbatim copy Dr. Guitarri's, was typed and prepared not by Dr. Ostella or his staff, but by the law firm for the hospital seeking the appointment of a guardian Both Dr. Guitarri and Dr. Ostella are employees of the hospital and, therefore, have a conflict of interest, that would have prevented them from disagreeing with the hospital's desire to have Florence declared incompetent and a guardian appointed over her person and property

As anyone who has ever met Florence can attest, and as now even Ms. Englander concedes, Florence is not "minimally verbal," as claimed in paragraph 17. Dr. Ostella's claim that Florence is suffering from dementia is based on the fact that when he asked Florence why she was brought to the hospital, she allegedly answered that she wanted to eat breakfast. It is not surprising that a woman who was being systematically starved by Dr. Guitarri by being taken off a regular diet, would ask to eat breakfast, and not be concerned with why she was brought to the hospital two weeks previously.

## THE PETITION'S DESCRIPTION OF FLORENCE'S PHYSICAL STATE IS ALSO ERRONEOUS

The Petition does not state Florence's weight at the time of her admission to the hospital. At the time she was admitted to the hospital, Florence was of average or above-average weight for someone of her height. The court rules explicitly require a Petition for Guardianship to include the weight of the Alleged Incapacitated Patient. Rule 4:86-2(b). This is especially important here because there is a baseless claim that Florence was diagnosed with "malnutrition."

10

A person who is malnourished will be severely underweight or otherwise suffering from a deficiency in certain nutrients.   Florence was neither underweight, nor suffering from any nutritional deficiency at the time of her hospital admission. I   understand   that   in   order   for someone to be labeled "malnourished," they have to either by severely underweight or otherwise deprived of certain nutrients, identifiable by blood tests. Clearly, Florence was neither of these or the Petition would surely have noted it.

The Petition incorrectly claims that Florence is non-ambulatory. This is not true. Florence has the capability to walk. Unfortunately, during her time in the hospital, her so-called attending physician, Dr. Guitarri, refused to allow Florence to be seen by a physical therapist, so that Florence could resume walking.

Dr. Guitarri told us that he did not believe that Florence suffered from any neglect whatsoever. So it is inexplicable that a certification purportedly read and signed by him (albeit prepared by the law firm) would claim that Florence suffered from any type of neglect. She most certainly did not.   The claim that Florence was dirty, foul smelling or unkempt is also unsupported by any facts and not indicative of anything;  persons being admitted to the hospital are rarely in their best condition.

If there was neglect in this case, it was committed when Florence was at Newark Beth Israel Hospital. On one visit, my brother observed that the medical staff has placed Florence in a diaper instead of walking her to the bathroom or using a bed pan.  Florence had never worn diapers before in her life. What is worse, while in the hospital, Florence was allowed to lie in her own feces for several hours before the diaper was removed. Isn't that neglect?  My brother also witnessed an aide state that she would "beat up" Florence for "making a mess." So the only time that Florence was "dirty, foul smelling and unkempt" is when she was allowed by the hospital to lie in her own feces for several hours.

The claim that Florence was "not eating well" is patently false. I visited with Florence in the hospital less than 24 hours after she was admitted.  Florence was immediately placed on a regular diet by the hospital. I personally witnessed Florence feeding herself solid foods and

digesting same without any problem.

Paragraph 9 of the Petition also claims that "it is not possible to predict whether the Patient will require any other procedures during this admission." However, paragraph 32 below states that "At this time, the Patient is ready for discharge. . . and is no longer in need of acute hospital care." Which statement was the truth? This is a glaring inconsistency. One the hand, paragraph 9 sought to argue that Florence was in bad medical shape; paragraph 32 claims "she is ready for discharge." In fact, Florence was discharged to a nursing home one week after the Petition was filed.

Florence did not and does not require twenty-four hour nursing home care. Florence has repeatedly stated to us and others recently that she does not want to live in a nursing home or even an assisted living facility. Florence wants and needs to remain at home, with appropriate medical supervision.

The statement that Florence "will thrive best in a supervised nursing home setting" in itself clearly demonstrates that the hospital's law firm has an axe to grind. Nobody "thrives" in a nursing home. It is an institution of last resort. A place where people go to die.

It is again worth pointing out to Your Honor that the Appellate Division panel neither addressed nor resolved any of these issues. They did not affirm the judgment of incapacity. This simply dismissed the appeal on a technicality, having nothing to do with the merits of this case.

## The Public Guardian Should Submit an Inventory and Accounting

The only party who is in a position to submit an inventory or accounting of Florence Siegal's assets and income is the Public Guardian. Pursuant to N.J.S.A. 3B:12-63 and Rule 4:86-6(c), we demand the Public Guardian to submit and Inventory and upon its immediate discharge, an accounting of Florence Siegal's assets.

## Visitation of Florence and Presumption of Innocence

This court should Order that I and my family be permitted to resume visitation of

12

Florence Siegal immediately.   There is no legitimate reason why even supervised visitation should be "restricted" or "barred." We have been banned from visitation without even giving us the opportunity to be heard as to why we should be allowed to resume visitation. The fact that a young police officer wrongfully accused my mother of neglecting Florence should not be a basis to revoke the power of attorney Florence signed 7 years ago, and it should not be a basis to ban visitation. In order for a Guardian to be appointed, a court must necessarily find that the Power of Attorney should be revoked. We should have had an opportunity to be heard and to refute any allegations in this courtroom. There was a clear lack of due process in the way this hearing was conducted, both for me and for Florence.  This result cannot stand.

### Even if Florence would be deemed incapacitated, the Power of Attorney she executed 8 years ago must be respected .

In the year **2000**, Florence designated me as her Power of Attorney in the event she became incapacitated. She also named me in her Health Care Proxy. This Power of Attorney and Health Care Directive were prepared by an attorney-at-law and properly executed at a time when Florence was undeniably competent. (Indeed, in upholding a default judgment taken against Florence in **2002**, Your Honor implicitly held that she was then competent because default judgments can only be entered against competent parties.)

In the unlikely event that Florence would be declared incompetent after such a hearing, the Power of Attorney Florence executed seven (7) years ago should be respected and not invalidated or revoked.  It is clear that a person's formal plan for handling of her property validly established by her should not be lightly set aside or disregarded by the courts. Estate of Teufel, ___ Misc.3d _____ (N.Y. 2006), citing Estate of Murray, _____ Misc.3d._____ (N.Y. 2006). _

It should also be pointed out that the Appellate Division has held that a judge may not disregard the previously-expressed wishes of an incompetent person in creating a trust or

13

executing a power of attorney while she was previously competent. In Re Chandler, 337 N.J. Super. 600 (App. Div. 2001). In Chandler, the Appellate Division held that the lower court improperly revoked a trust created by a woman in order to transfer the trust's assets to the Office of the Public Guardian. The Chandler court held that **"courts and guardians are required to respect the intention expressed by an incapacitated person prior to the onset of incapacity."** Here, Florence's intentions were clear in naming the Brookmans in her Power of Attorney and Health Care Directive back in the year 2000, when she was clearly competent. (See attached Doctors' letters confirming Florence's Competence at the time the Power of Attorney and other documentation was signed- **Exhibit C**).

As in Chandler, in this case Your Honor "gave the Public Guardian carte blanche without considering any less restrictive alternatives" such as a limited guardianship or no guardianship at all given the fact that Florence is not presently incompetent.

In the unlikely event, that Florence would be determined to be incompetent, we wish to inform the Court that he simply wants Florence to return to the home with appropriate care and supervision. Most importantly, Florence has repeatedly stated on videotape that she does not wish to live in a nursing home or even assisted living. **Florence wants not only to allow the Brookmans to visit her, Florence wants to resume living at home. In a videotape taken of Florence on May 17, 2007 Florence stated she wants to live with the Brookmans. The Court must respect her wishes.**

Therefore, I am requesting that Your Honor amend your Order to appoint me as guardian of Ms. Siegal or permit me to invoke the Power of Attorney discussed above. (I must note, however, that my position is that Florence is not incompetent and thus requires no guardian.).

This case originated with allegations made by a single police officer to which Your Honor did not even permit the Brookmans to respond to. There is in this country a presumption of innocence. The Brookmans should have been permitted to refute the allegations. They were not; instead Your Honor apparently assumed the allegations to be true, therefore causing you to sign

14

the Order declaring Florence incompetent, revoking the power of attorney and even forbidding visitation, or what the Order strangely refers to as "access." There was absolutely no evidence submitted or argument made why the properly executed power of attorney, signed by Florence at a time when she was indisputably competent, should have been revoked, especially as to all 3 of the Brookmans. Nor was there any evidence submitted or argument made why all 3 of the Brookmans should be denied visitation. These were simply provisions which were slipped into the order prepared by the Public Guardian at the last moment without any explanation or prior notice that would have given the Brookmans the opportunity to submit papers why the power of attorney should not be revoked and why visitation should not be indefinitely barred. Indeed, the Verified Complaint filed by the Petitioner never even addressed the subject of visitation or the revocation of the Power of Attorney.

As Your Honor should already be aware, no charges were ever even filed against Howard alleging any wrongdoing with regard to Florence. Therefore, to the extent Your Honor does not wish to revisit the issue of Florence's competency, there is no legitimate reason why at least Jeffrey and/or Howard Brookman, as long-time family friends of Florence and her later brother should not be appointed as guardian over her person or alternatively be permitted to invoke the Power of Attorney. Again, the Brookmans do not concede the Florence is currently incompetent.

Your Honor must recognize that in the year 2000 Florence expressed her intention that, in the event of her incapacity, Jeffrey and Howard Brookman be designated to act for Florence, and not complete bureaucratic strangers in Trenton. With all due respect, Your Honor, it was wrong for the Power of Attorney to have been revoked on the basis of a false allegation, which the Brookmans were not even permitted to respond to. It would be only wronger for Your Honor to revoke the Power of Attorney now that the charges against Jeffrey have been dismissed.

For 11 straight days, at least one of the Brookmans visited Florence in the hospital without any incident or problem whatsoever. They videoed her in the hospital and have proof that, contrary to what the doctor's certification states, she is able to follow commands, straighten and raise her legs, and eat on her own.

I also believe it is important for Your Honor to know the fully story of what happened

15

with the police officers. On May 9, 2007 and May 10, 2007, the Brookmans were subjected to egregious misconduct by several officers of the Hillside Township Police Department. Among other things, they were subjected to anti-Semitic slurs, repeated threats of physical violence, and one officer falsely clamed to be the "Chief of Police."

One Hillside officer, repeatedly asked Howard Brookman "What is your religion?" Another Hillside officer stated that if he didn't answer the questions, he would take him and his little brother into another room where there was no camera and bash their heads. It was apparent that that officer knew what their religion was, but he wanted them to have to say it, like they were admitting to a crime. Finally, Howard had to state "I am Jewish. We are Jewish." The charges that were filed were simply a pretext for the officers to engage in this anti-Semitic conduct.

At a bare minimum, if Your Honor is unwilling to either revisit your incompetency determination or appoint Jeffrey or Howard as Florence's guardian or Power of Attorney, I respectfully submit that there is certainly now no legitimate reason whatsoever why both at least Jeffrey and Howard should not be permitted to resume immediate visitation with Florence. To continue to deny Jeffrey visitation of Florence based on an unfounded charge which has now been dismissed would be to perpetuate a terrible injustice and fail to recognize Florence's repeatedly-expressed desire to be with the Brookmans. So to, to continue to deny Howard visitation even though no neglect charge was ever filed against him would be improper. Moreover, there is no legitimate reason why Jeffrey and Howard should not be deemed "willing and responsible friends" capable of seeing that Florence's desire to live at home is respected.

## Any Guardianship Hearing must be heard in Hudson County

At the outset, it should be noted that the Guardianship proceeding was filed by the hospital in the wrong county. Florence has legal domicile and owns a home in Hudson County, the City of Bayonne. Therefore, any Guardianship Petition must be filed and heard in Hudson County. See In the Matter of Seyse, 353 N.J. Super. 580 (App. Div. 2002). Rule 4:83-4(b). Therefore, any evidentiary hearing of this matter must occur in Hudson County.

16

Additionally, there was no way I or my family could get a fair hearing in Union County. As Your Honor is well aware, several years ago, I was involved an unrelated probate litigation in Union County. The then-probate Judge Boyle was advised by Lisa Taylor Muhlstock. In the past estate litigation, Ms. Muhlstock incorrectly advised Judge Boyle to deny an evidentiary hearing without any substantive basis. Ms. Muhlstock's ruling was appealed and, as a result, the Appellate Division found Judge Boyle to be "patently in error" in denying a plenary hearing. Moreover, because the Appellate Division was so disgusted with the manner in which Judge Boyle and Ms. Muhlstock had treated my mother, the court specifically removed the case from Judge Boyle and remanded the matter for a hearing before a different judge. Ultimately, because it was acknowledged that my mother could not and would not get a fair hearing in Union County because Ms. Muhlstock continued to advise the new judge, the matter was transferred to another County. Now, several years later, Ms. Muhlstock is still in her post as staff attorney and has again incorrectly advised Your Honor, who is relatively new to the Probate Part, to deny a plenary hearing. More importantly, Florence should not have been declared incompetent and locked away in solitary confinement in a rush o judgment because Lisa Taylor Muhlstock's personal animosity towards me.

For the foregoing reasons, the entire order of July 5, 2007 should be reversed, including the appointment of a permanent guardian should be reversed; the declaration of incapacity of Florence should be reversed, and she should be allowed to return home, as is her desire. Additionally, visitation by the Brookmans should be permitted to resume immediately. Alternatively, a return to competency hearing with a jury must be conducted pursuant to Rule 4:86-7.

Respectfully submitted,

Howard Brookman, Esq.

Cc: Michael Dolan, Esq.

17

Howard Brookman, Esq.
145 Springfield Road
Elizabeth, New Jersey 07208
(908)-355-1921

| | |
|---|---|
| | : SUPERIOR COURT OF NEW JERSEY |
| | : |
| | : |
| | : CHANCERY DIVISION, |
| | : . . . . . Y, PROBATE PART |
| | : DOCKET NO |
| | : |
| IN THE MATTER OF | : |
| FLORENCE SIEGAL, | : |
| | : |
| An Alleged Incapacitated Person | : |
| | : |
| | : |
| | : |
| | : **CERTIFICATION OF** |
| | : **HOWARD BROOKMAN, ESQ.** |
| | : |
| | : |
| | : |

1. I am an attorney-at-law in the State of New Jersey and an <u>interested party</u> in this matter, having been named in a Power of Attorney executed . . . . nine (9) years ago.

2. I submit this certification and attached letter brief in support of my motion for a "return to competency" hearing, and to vacate the 2007 judgment, for visitation and various other relief.

3. The Motion to Vacate the Judgment and Orders of July 5, 2007 & May 25, 2007 is based in part on the fact that the one and only psychiatrist whose certification was submitted to court in support of a judgment of incapacity turns out to have been an impostor. Attached as **Exhibit A** is the signed purported certification of Frank Ostella, swearing to the fact that he is a Medical Doctor (M.D.) In fact, as confirmed by the

1

attached printout from the N.J. Attorney General's website, Ostella did not graduate from medical school and is not a medical doctor. He is in fact a doctor of osteopathy (D.O.) As he was one of the two required physicians to submit a certification, Your Honor relied on Ostella's certification in declaring Florence incapacitated and, as it now turns out, Your Honor was misled and a fraud was perpetrated on the Court. It was solely on the basis of the certification's claim about Florence's mental state, that she was declared incapacitated, turned over to the Public Guardian and sentenced to a life in isolation in a nursing home. If the certification attributed to Ostella, but actually written by a law firm 1st-year associate, Eric Gross, could have lied about Ostella's education and accreditation, than nothing else contained in that certification can be believed, including his claim that he ever met with Florence. In fact, Ostella never prepared any Consultation Report that would have been prepared if he, in fact, met with Florence.

4. In support of the demand for a return to competency hearing, I submit a March 2008 Certification of Judith Englander, a Social Worker and Case Manager with the Public Guardian's Office. Perhaps the greatest argument against the suggestion that Florence is currently incapacitated is set forth in Ms. Englander's certification. Judith Englander's description of Florence as someone who is "an active participant in music and art activities;" as someone who "attends a      religious service and enjoys singing the songs, which are      very familiar to her;" and as someone      who "is alert and answers questions" is at odds with the      description of Florence put forth by the two physicians in their now-discredited   certifications, certifications    which      essentially falsely made Florence out to be a vegetable.

At a minimum, Florence must be examined by a neutral physician to determine her present competency status..

Attached as **Exhibit B** is the March 2008 Certification of Judith Englander.

5. It is essential for Your Honor to understand that Howard Brookman has never been charged with any neglect or any wrongdoing related to Florence. Therefore, any decision

2

to revoke the power of attorney naming Howard and deny Howard visitation was clearly erroneous and must be reconsidered and reversed now.

6.   Attached as **Exhibit C** are numerous certifications and medical records all indicating that that there was no neglect of Florence. Included among these papers are letters from two psychiatrists, both of whom, unlike Frank Ostella, are real medical doctors. These psychiatrists wrote letters on their own stationary in their offices in Florence's hometown of Bayonne. One of these psychiatrists attests to the fact that Florence "is competent to manage her own affairs and make decisions . . . such as assignation of a Power of Attorney." The second psychiatrist notes that Florence "has no evidence of any Dementia or any other Major Psychiatric Disorder. She is totally capable of making decisions regarding her legal, financial, and other social affairs." The above is relevant because it proves false Mr. Dolan's empty claim that Florence may have been incapacitated since 2000. A third medical doctor, an internist, also wrote that Florence "is competent to make decisions regarding her welfare." Also included in Exhibit C is a letter from a R.N., M.S.N., who met with Florence in the hospital just one week after her admission. The Registered Nurse has a Masters of Science Degree in Nursing Gerontology and is, therefore, an expert on the elderly.

7.   Attached as **Exhibit D** is the notice from our adversary that lists us as "interested parties" in the matter that came before Your Honor this past June. Therefore, there was no need for us to have filed an application to intervene.

8.   Attached as **Exhibit E** is a letter that was submitted to Your Honor by my counsel. The letter, submitted prior to the June 21 proceeding, requests a brief adjournment so that a more formal written opposition could be submitted . The first-year associate, Eric Gross, refused to consent to an adjournment because he did not want to take any chances that his defrauding of the court would be exposed. A member of your staff or the Surrogate's staff improperly denied that request for an adjournment without even presenting the letter to you for you to make a decision. Importantly, that letter also stated that I oppose the Guardianship application and demanded a jury trial on Florence's behalf. Apparently, this request was also ignored as the Final Judgment signed July 5 erroneously claims that no jury trial was demanded.

3

9.   Attached as **Exhibit F** is the July 5, 2007 Order falsely declaring Florence Siegal incapacitated and erroneously revoking a Power of Attorney duly executed by her in 2000.

10.   Attached as **Exhibit G** is the pertinent pages of the November 10, 2000 Power of Attorney drafted by an attorney and executed by Florence which was revoked, as to all the Brookmans, without any basis whatsoever.

I certify that the foregoing statements may by me are true. I am aware that if any of the foregoing statements are willfully false, I may be subject to punishment.

Howard Brookman

Dated: January 4, 2010

4

|                         | : SUPERIOR COURT OF NEW JERSEY |

```
                              : SUPERIOR COURT OF NEW JERSEY
                              :
                              :
                              : CHANCERY DIVISION,
                              :        PROBATE PART
                              : DOCKET NO. O-7520
                              :
IN THE MATTER OF             :
FLORENCE SIEGAL              :
                              :
                              :
                              : FIRST AMENDED FINAL JUDGMENT
                              :
                              :
                              :
```

THIS MATTER, having been opened to the Court, by Howard Brookman, and the
Court having reviewed and reconsidered its earlier decision;

It is on the _____ day of _____, ORDERED AND ADJUDGED as follows *nunc
pro tunc* to June 21, 2007;

1. That the Public Guardian for Elderly Adults be and hereby is discharged as guardian
   as the person and property of Florence Siegal and that any Letters of Guardianship
   issued to him be revoked.

2. That the designation made by Florence Siegal of an attorney-in-fact under a
   Durable Power of Attorney executed by her in the year 2000, prior to the
   onset of any incapacity, is hereby reinstated.

3. That Jeffrey Brookman and/or Howard Brookman be permitted to immediately
   invoke said Power of Attorney and exercise any an all powers granted to them
   therein by Florence Siegal.

4. That the designation made by Florence Siegal of a proxy in the year 2000, for
   purposes of making health care decisions on Florence Siegal's behalf, is hereby
   reinstated.

5. That Jeffrey Brookman and/or Howard Brookman shall have the authority to make

any and all medical decisions including mental health decisions regarding Florence Siegal including but not limited to the authority to consent or withhold consent to surgical procedures and such other procedures reasonably attendant thereto and any decisions concerning withdrawal or denial of life support shall be exercised in full compliance with existing statutory and case law.

6. Jeffrey and/or Howard Brookman are considered personal representatives under the Standards for Privacy of Individually Identifiable Health Information ("Privacy Rule") issued pursuant to the Health Insurance Portability and Accountability Act of 1996 ("HIPAA") and shall have full and complete access to all records of Florence Siegal.

7. That Jeffrey and/or Howard Brookman be and are hereby appointed as guardian of the person and property of Florence Siegal and that Letters of Guardianship be issued to them upon their filing an acceptance and duly qualifying with the Surrogate _____. Jeffrey and/or Howard Brookman shall have all the powers vested in the Court under N.J.S.A. 3B:12-49 and this Judgment will serve as authorization for immediate access and powers over all assets of Florence Siegal.

8. That the Office of Public Guardian submit an formal accounting to the Court with a copy to Jeffrey and Howard Brookman of any income and assets that the Office of Public Guardian has had any access, control or dominion over covering the time period May 25, 2007 to October ____ 2009 within __ days.

9. That Jeffrey, Howard and Barbara Brookman be immediately permitted to resume visitation with Florence Siegal at the nursing home at which she is currently residing.

10. That Florence Siegal be permitted to return to 902 Salem Avenue, Hillside upon reasonable notice to the nursing home at which she is currently residing.

_____

                    P.J. Ch.

2